IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

JOHN H. HALL, JR.     .                                                        PLAINTIFF

     V.                    Civil No. 2:21-cv-02083-PKH-MEF

KILOLO KIJAKAZI[1], Acting Commissioner,
Social Security Administration                                                 DEFENDANT


## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, John Hall, Jr., brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (the "Commissioner") denying his claim for a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI") benefits under Titles II and XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

### I.     Procedural Background

Plaintiff filed his applications for DIB and SSI on February 2, 2017, and July 19, 2018, respectively, alleging disability since December 31, 2012[2], due to back, leg, and shoulder problems, as well as depression. (ECF No. 12, pp. 107, 119, 195-201, 210-215, 218-219, 233,

---

[1] Kilolo Kijakazi became Acting Commissioner of the Social Security Administration on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] At the administrative hearing, Plaintiff amended his onset date from June 10, 2008, to December 31, 2012. (ECF No. 12, p. 46).

250-251). An administrative hearing was held on September 18, 2018. (*Id*. at 42-82). Plaintiff was present and represented by counsel.

Born in 1968, Plaintiff was 44 years of age on his alleged onset date and possessed a high school education with some mechanical training. (ECF No. 12, p. 28). Although he had past relevant work ("PRW") experience as a street department laborer and dump truck driver, he performed no substantial gainful activity after his amended alleged onset date. (*Id*. at 17, 28, 234, 240-247).

On June 12, 2019, the Administrative Law Judge ("ALJ") entered an unfavorable decision, acknowledging ALJ Bill Jones' April 8, 2014, decision denying Plaintiff's May 31, 2012, DIB application.[3] (ECF No. 12, p. 15). As such, he acknowledged that res judicata barred Plaintiff's Title II application because both his amended onset date and date last insured, December 31, 2012, preceded the date of the prior ALJ's decision. (*Id*. at 15, 17). The ALJ went on to consider Plaintiff's Title XVI application, finding his spine disorder and other unspecified arthropathies to be severe, but assessing his hypertension, diabetes mellitus type II, and depression as non-severe impairments, and ultimately concluding that the Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id*. at 18-20). Further, he determined that the Plaintiff could perform light work with only occasional balancing, stooping, kneeling, crouching, crawling, and climbing. (*Id*. at 21). Because the Plaintiff cannot perform his PRW, which was considered medium level work, the ALJ relied on the testimony of a vocational expert ("VE") who indicated

---

[3] At the administrative hearing, the ALJ and Plaintiff's counsel had a discussion regarding the effect res judicata would have on the Plaintiff's present DIB application. (ECF No. 12, pp. 46-47). Neither the ALJ nor counsel completely understood why the present DIB application was allowed to proceed, given the prior decision, but counsel believed it had been allowed to proceed because the Agency found that it contained some new and material allegations. However, counsel admitted that the Plaintiff had a very slim chance of prevailing. (*Id*. at 46).

that the Plaintiff could perform work as a power screwdriver operator, collator operator, and compression molding machine tender. (*Id*. at 29).

The Appeals Council denied Plaintiff's request for review on February 25, 2021. (ECF No. 12, pp. 6-11). Plaintiff subsequently filed this action on April 26, 2021. (ECF No. 2). Both parties have filed appeal briefs (ECF Nos. 15, 16), and the matter is ready for Report and Recommendation.

## II. Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance but enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019). We must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014). If there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id*.

A claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical

or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The fact finder only considers Plaintiff's age, education, and work experience in the light of his residual functional capacity ("RFC") if the final stage of the analysis is reached. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

### III. Discussion

Plaintiff has raised several issues on appeal, the most concerning of which are the ALJ's failure to develop the record and his RFC determination. This case, however, is complicated by the fact that the Plaintiff's 2012 DIB application was denied by ALJ Bill Jones on April 8, 2014, and it covers the Plaintiff's disability status through his date last insured. As such, res judicata bars both the ALJ and the Court from reconsidering this period. *Robbins v. Sec'y of Health & Human Servs.*, 895 F.2d 1223, 1224 (8th Cir. 1990) (per curiam) (holding bar applies to subsequent applications for benefits based on the same facts and issues the Commissioner previously found to be insufficient to prove the claimant was disabled); *Janko v. Sec'y of Health, Educ. & Welfare*,

4

589 F.2d 365, 367 (8th Cir. 1978); *see generally* 20 C.F.R. § 404.957(c)(1). However, especially in the context of a progressive disease or degenerative condition, as exists in the present case, evidence that was offered as proof of disability but not found persuasive by an ALJ in a prior proceeding, may be considered in a subsequent proceeding in combination with new evidence for the purpose of determining whether claimant became disabled *after* the ALJ's previous decision. *See Groves v. Apfel*, 148 F.3d 809, 810-11 (7th Cir. 1998) (stating "there is no necessary inconsistency in finding [a claimant] not disabled at time t but disabled at t +1," and thus, there is "no absolute bar to the admission in the second proceeding of evidence that had been introduced in the prior proceeding yet had not persuaded the agency to award benefits"); *see also Rogers v. Chater*, 118 F.3d 600, 601 (8th Cir. 1997) (noting a claimant generally cannot seek benefits in a subsequent proceeding for any time period for which the prior proceeding had denied benefits). Therefore, the period at issue in the present case begins on April 9, 2014, and then extends through the present ALJ's decision.

Plaintiff contends the ALJ failed to develop the record by ordering additional RFC assessments after he filed his SSI application in July 2018. The ALJ owes a duty to a claimant to develop the record fully and fairly to ensure his decision is an informed decision based on sufficient facts. *See Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004). However, the ALJ is not required to function as the claimant's substitute counsel, but only to develop a reasonably complete record. *Whitman v. Colvin*, 762 F.3d 701, 707 (8th Cir. 2014) (citing *Clark v. Shalala*, 28 F.3d 828, 830-31 (8th Cir. 1994)). While "[a]n ALJ should recontact a treating or consulting physician if a critical issue is undeveloped," "the ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine

whether the claimant is disabled." *Johnson v. Astrue*, 627 F.3d 316, 320 (8th Cir. 2010) (quotation, alteration, and citation omitted).

RFC is the most a person can do despite that person's limitations. 20 C.F.R. §§ 404.1545, 416.945. A disability claimant has the burden of establishing his or her RFC. *Vossen*, 612 F. 3d at 1016. "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010); *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The Eighth Circuit Court of Appeals has held that a "claimant's residual functional capacity is a medical question." *Miller*, 784 F.3d at 479 (citing *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012).

In the present case, the only RFC assessments dated during the relevant period were completed in 2017, one year prior to the filing of Plaintiff's SSI application. Agency physician William Payne, M.D., reviewed the record on June 6, 2017, and concluded there was insufficient evidence to rate the Plaintiff's physical impairments. (ECF No. 12, p. 113). On October 19, 2017, Dr. Charles Friedman, M.D., conducted an independent review of the record and affirmed Dr. Payne's assessment that the record was insufficient to decide. (ECF No. 12, p. 126). Thereafter, approximately 500 additional pages of medical evidence was submitted, documenting Plaintiff's ongoing treatment for left shoulder and ankle pain, as well as a subsequent tibial fracture.

We begin the analysis by acknowledging ALJ Jones' April 8, 2014, determination that Plaintiff's disorder of the lumbar spine, hypertension, and status post tibia fracture with open reduction and internal fixation limited him to sedentary work with occasional climbing, balancing, stooping, kneeling, crouching, and crawling. (ECF No. 12, pp. 15, 88-89). As previously mentioned, this limits our consideration of the evidence to medical records dated between April 9, 2014, the day after ALJ Jones' determination, and June 12, 2019, the date of ALJ Shilling's decision. This necessarily requires us to reject the Plaintiff's application for DIB because a DIB applicant must show that he became disabled on or before his date last insured, which, in this case, was evaluated in ALJ Jones' 2014 decision. *Simmons v. Massanari*, 264 F.3d 751, 755 (8th Cir. 2001); *Pyland v. Apfel*, 149 F.3d 873, 876 (8th Cir. 1998) (holding claimant who becomes disabled after expiration of insured status is not entitled to DIB).

To set the stage, we note that the Plaintiff suffered a tibial plateau fracture requiring a partial medial meniscectomy with percutaneous pinning and arthroscopic assisted open reduction with internal fixation in June 2006. (ECF No. 12, pp. 688-689).

In August 2008, the Plaintiff initially injured his left shoulder in a fall. (ECF No. 12, pp. 616-618). Upon reinjury in October 2013, the Plaintiff exhibited a decreased range of motion and pain with manipulation. (ECF No. 12-1, pp. 54-55). However, x-rays revealed no abnormalities. (*Id*. at 332).

He also had a lengthy history of lower back issues, culminating in interbody fusion at the L5-S1 level posteriorly, a foraminotomy, and a laminectomy in December 2008. (ECF No. 12, pp. 680-686). In November 2013, an MRI of his lumbar spine showed a bony bridge from the lower portion of the L5 vertebra on the left side to the posterior elements producing moderate narrowing of the left exit foramen at this level and mild disk bulging and posterior element

hypertrophic changes producing mild to moderate exit foramen narrowing bilaterally at the L5-S1 level. (ECF No. 12-1, pp. 333-334).

On August 14, 2014, Dr. Brian Goodman administered a caudal epidural steroid injection at right L5-S1 level for a diagnosis of lumbar radiculopathy. (ECF No. 12-1, pp. 524-527).

In September 2014, Plaintiff's primary care provider, advanced practical nurse Carmen Oxford, evaluated him for left shoulder pain. (ECF No. 12-1, p. 294). The medication prescribed for his back did not help the shoulder. An MRI of the shoulder revealed arthritic changes about the shoulder with narrowing of the glenohumeral joint space and a possible tiny tear of the superior labrum with thickening of the inferior glenohumeral ligament. (*Id*. at 593-597). Physical exam findings included mild swelling, tenderness to palpation across the lateral cuff insertion, 100/180 degrees of forward flexion, and 80/150 degrees of abduction. Orthopedist, Trent Johnson, M.D., administered a steroid injection into the Plaintiff's left shoulder on October 10, 2014. (*Id.* at 642-643).

On December 9, 2014, the Plaintiff returned to Dr. Johnson with complaints of left shoulder pain radiating down the lateral aspect of his arm. (ECF No. 12-1, pp. 644-645). At this time, the range of motion in his left shoulder had decreased to 80 of flexion and 60 degrees of abduction with continued tenderness across the lateral cuff insertion and bicipital groove and 4/5 strength with shoulder abduction and external rotation. Dr. Johnson administered another steroid injection.

On February 10, 2015, Plaintiff reported some improvement in his left shoulder pain. (ECF No. 12-1, pp. 646-647). However, due to impingement of the left shoulder and his history of adhesive capsulitis with no long-standing relief from injections or therapy, Dr. Johnson performed a left shoulder arthroscopy with limited debridement, left rotator cuff repair, biceps tenotomy, and

subacromial decompression with debridement of the subacromial spurs on February 18, 2015. (*Id*. at 531-535, 651-655).

Two weeks status-post surgery, Plaintiff reported numbness in his fingertips, mainly the thumb, index, and middle fingers, as well as some swelling and tenderness across the lateral cuff insertion. (ECF No. 12-1, pp. 656-657). Dr. Johnson noted decreased sensation in the median nerve distribution, a positive carpal tunnel compression test, and forward flexion to 90 degrees with minimal pain. On March 31, noting continued tenderness and decreased strength with internal rotation, he referred the Plaintiff to physical therapy and advised him to continue his home therapy for passive rotator cuff range of motion. (*Id*. at 658-659).

On May 28, Plaintiff complained of persistent numbness and tingling in his left hand. (ECF No. 12-1, pp. 660-661). Although the pain, range of motion, and strength had improved, Plaintiff exhibited clinical signs of cubital tunnel syndrome. Accordingly, Dr. Johnson prescribed a night splint and Diclofenac.

In June, Plaintiff returned to Nurse Oxford in follow-up of his lower back pain. (ECF No. 12-1, pp. 300-301). He indicated that the epidural steroid injections prescribed by Dr. Mark Madden in November 2007 had not been beneficial and requested a second opinion.

The following month, Plaintiff sought out emergent treatment for complaints of right knee pain. (ECF No. 12-1, pp. 536-540, 597-598). He reported that an old knee injury had caused him to fall. Plaintiff was now experiencing knee pain that radiated up to his hip and down to his mid-calf. Although x-rays were unremarkable, an exam revealed a decreased range of motion in the right knee with tenderness to the patellar tendon. Plaintiff was diagnosed with knee strain.

On July 22, Plaintiff complained of increased left shoulder pain resulting from a scooter accident two weeks earlier. (ECF No. 12-1, pp. 301-303). The pain radiated into his neck and

9

chest. Dr. Johnson examined the Plaintiff, noting mild swelling across the shoulder, mild diffuse tenderness to palpation, 120/180 degrees of flexion, 80/150 degrees of flexion, and a mild degree of anterior apprehension. (*Id*. at 662-663). He did not feel that Plaintiff had a recurrent tear of his rotator cuff, so he prescribed therapy and strengthening exercises, as well as Hydrocodone.

On August 5, 2015, sports medicine specialist, Thomas Cheyne, M.D., provided a second opinion concerning Plaintiff's lower back pain. (ECF No. 12-1, pp. 664-667, 715-716). Noting a 20% decreased range of motion in the neck in all directions; tenderness across the lower back; difficulty walking on toes and heels; decreased sensation in his left lower leg; and mildly positive straight leg raise tests bilaterally, Dr. Cheyne diagnosed chronic sciatica with underlying spinal fusion at the L5-S1 level and moderate foraminal stenosis. He recommended a series of three epidural steroid injections, a restriction to light activity, and hot baths/showers twice daily.

On September 22, after experiencing several episodes of subluxation of the shoulder with acute pain with mild activities and lifting, Dr. Johnson ordered an MRI of his left shoulder. (ECF No. 12-1, pp. 672-673). The MRI revealed minimally increased signal intensity in the tendons possibly due to tendinopathy; arthritic change in the area of the glenohumeral joint space with cartilaginous loss and spurring from the humeral head; a small, focal, low-signal-intensity structure within the inferior recess of the shoulder joint with possible small loose bodies; and a small anterior focal area of increased signal intensity within the superior labrum possibly representing a partial tear of the superior labrum. (*Id*. at 607-610, 717-720). Accordingly, on December 23, 2015, Dr. Johnson performed a left shoulder arthroscopy with a bicipital tenotomy and removal of the loose bodies. (*Id*. at 680-683).

On January 27, 2016, Plaintiff presented to family nurse practitioner, Hayley Hill for treatment of his lower back pain. (ECF No. 12-1, pp. 311-314). An exam revealed a decreased

range of motion with bony tenderness in the lumbar spine. Due to an increased level of pain, the Plaintiff reported that he had increased his consumption of pain medication. Nurse Hill warned him of the dangers associated with overdosing.

The following day, he advised Dr. Johnson that he had recently fallen and aggravated his lower back and left shoulder pain. (ECF No. 12-1, pp. 686-688). Due to tenderness and continued range of motion deficits, Plaintiff was referred to physical therapy and provided a refill of his pain medication. He did not, however, participate in physical therapy. (*Id*. at 689-690). And when he returned to Dr. Johnson in February, he reported soreness with activities such as lifting and reaching. He was again referred to physical therapy.

On March 21, Nurse Oxford treated the Plaintiff for right knee pain due to recent dislocation. (ECF No. 12-1, pp. 314-315). A knee immobilizer made ambulation difficult. Because his pain had not improved much since the initial injury, Nurse Oxford referred him back to orthopedics. And, following a consult on April 5, Dr. Johnson administered a steroid injection into his right knee. (*Id*. at 691-693, 721).

On June 2, 2016, Plaintiff was transported to the ER after suffering a dizzy spell and falling. (ECF No. 12-1, pp. 555-561, 614-621). He hit his left shoulder on the wall, further aggravating his pain. An exam revealed tenderness to the left shoulder, but no range of motion deficits, while x-rays showed only postoperative changes.

Plaintiff returned to the ER the following day, with worsening left shoulder pain. (ECF No. 12-1, pp. 562-566). An exam revealed diffuse tenderness to palpation but no crepitus or deformity. Plaintiff also indicated that he had run out of his Ultram. And records reveal this was because he continued to take more pain medication than prescribed.

Nurse Oxford next treated him for increased lumbar pain on June 8. (ECF No. 12-1, pp. 316-318). He reported numbness radiating from his left buttock down his leg and into his toes making it difficult for him to ambulate. On exam, Nurse Oxford documented a decreased range of motion and tenderness in the lumbar spine prompting her to order x-rays of his spine.

On June 13, 2016, Plaintiff began treatment with pain specialist, Adam Sewell, M.D., and his staff at Arkansas Pain and Wellness for diagnoses of left shoulder pain secondary to impingement syndrome, biceps tendinitis, chronic sciatica, chronic right knee pain and diabetic neuropathy. (ECF No. 12-1, pp. 63-70, 342-359). He noted that the Plaintiff had failed both physical therapy and injections. On exam, he recorded tenderness in the upper, mid, and lower lumbar facet joints; decreased lumbar rotation; increased pain with rotation on facet loading; tenderness along the left shoulder with a decreased range of motion; a positive Hawkin's test on the left shoulder; right knee tenderness at the infrapatellar, medial knee, lateral knee, medial fat pad proximal to the joint line, and saphenous nerve; and positive straight leg raise tests bilaterally. Dr. Sewell increased Plaintiff's Gabapentin and Hydrocodone dosages and prescribed Voltaren gel.

An MRI of Plaintiff's thoracic spine conducted on June 27, 2016, showed a right lateral and paracentral disc protrusion at the T11-12 level; a Schmorl's node deformity on the superior aspect at the T12 level; and a moderate diffuse disc bulge with biforaminal encroachment at the L4-5 level. (ECF No. 12-1, pp. 86-87, 360-361, 495-496). Accordingly, Dr. Sewell prescribed a TENS unit and provided mediation refills for continued pain, which the Plaintiff rated as a 7 on a 10-point scale. (*Id*. at 75-82, 362-375).

In July, Plaintiff indicated that his pain remained stable, now at a 6/10, with medication. (ECF No. 12-1, pp. 88-95, 376-389). Due to no changes in his physical exam, Dr. Sewell continued his medications.

The next month, Plaintiff treated with both Nurse Oxford and Dr. Sewell on August 23. (ECF No. 12-1, pp. 99-105, 319-321, 390-401). Nurse Oxford noted his "continued disability due to left shoulder and lower back pain," stating that he remained unable to work due to these "joint problems." She recommended strict diet control. Dr. Sewell offered the Plaintiff injections, but due to his prior experience with an injection hitting the nerve, he declined. Dr. Sewell then prescribed a back brace.

In September, amid notations that Plaintiff's pain was relatively stable on the medications prescribed, Plaintiff reported continued numbness and weakness in his legs. (ECF No. 12-1, pp. 108-115, 402-417). Dr. Sewell referred him to a neurosurgeon, noting Plaintiff's hesitation to consider further surgical intervention. He also prescribed a short course of anti-inflammatories and use of the back brace for up to three hours per day.

The next month, Plaintiff again ran short on his pain medication. (ECF No. 12-1, pp. 119-129). His pain, however, remained stable at a 6/10 through December. (*Id*. at 131-140, 142, 157-176, 321-323, 418-422, 435-450). In January 2017, Dr. Sewell noted increased lumbar back pain with extension and flexion of the back, consistent with the lumbar spondylosis and degenerative disk disease shown on his most recent MRI. (*Id*. at 177-186).

On February 3, 2017, Plaintiff was transported to the ER after a six-to-seven-foot fall from a stepladder. (ECF No. 12-1, pp. 567-572, 622-624). On exam, he exhibited a decreased range of motion with pain and tenderness in the right shoulder and right knee. An x-ray of his right knee

revealed a tibial plateau fracture, while x-rays of his right shoulder were suggestive of a bony bankart lesion involving the inferior glenoid labrum.

On follow-up with Dr. Timothy Maryanov at Arkansas Pain and Wellness, it was noted the Plaintiff had filled two prescriptions for Oxycodone from his orthopedic surgeon since his last visit. (ECF No. 12-1, pp. 187-198). As such, he indicated that he would not resume prescribing Plaintiff's pain medication until he received verification that the Plaintiff had been released from the surgeon's care. He did, however, refill Plaintiff's Gabapentin.

In March, Plaintiff continued to wear the right knee immobilizer. (ECF No. 12-1, pp. 199-208). He also had some tenderness in the right lower extremity and the right upper extremity. Although the Plaintiff reported some improvement in April, this was offset by increased weakness in the right leg in May. (*Id*. at 220-230). Plaintiff indicated that the knee had buckled several times, causing him to fall. Dr. Sewell offered him physical therapy, which the Plaintiff declined, opting instead to give it a little more time.

The following week, Plaintiff was again short on his pain medication but did not request an early refill. (ECF No. 12-1, pp. 231-241). Instead, he said he would "make it work." To ensure his medication compliance, Dr. Maryanow saw him again on June 29, at which time he was only two days short on his medication and his urine drug screen was noted to be consistent with the medications prescribed. (*Id*. at 242-251, 451-462). Therefore, Dr. Maryanow increased his Oxycodone dosage.

When he returned on July 20, he was in an ankle boot due to yet another accident. (ECF No. 12-1, pp. 252-261, 463-474, 511-518). Dr. Maryanow noted that the increased dosage of Oxycodone had been helpful.

In August, Dr. Maryanov advised the Plaintiff that their clinic would be closing. (ECF No 12-1, pp. 262-269, 475-481). Accordingly, he prescribed a wean down dosage of his pain medication.

On September 26, Nurse Oxford treated the Plaintiff for a possible skin infection to his right foot. (ECF No. 12-1, pp. 626-629). She noted a decreased range of motion and pain in his shoulder. Nurse Oxford prescribed antibiotics and, despite his diabetes, by October 5, the infection had almost completely healed. (*Id*. at 630-631).

In November, Plaintiff treated with Dr. Ryan Pitts at Health Blooms Wellness for lower back and thoracic pain. (ECF No. 12-1, pp. 508-511). Dr. Pitts recorded a reduced range of motion in the cervical and lumbar spine due to pain with flexion, rotation, extension, and side bending and tenderness in the cervical and lumbar paraspinals.

On December 14, while performing outdoor work, a tree trunk swung back and struck him in the right leg just above the ankle. Dr. Justin Clayton at Mercy Orthopedics diagnosed a fracture through the metadiaphyseal junction of his distal tibia with extension toward the tibial plafond. (ECF No. 12-1, pp. 694-696). Due to the location of the fracture, Dr. Clayton was apprehensive about tibial nailing. Therefore, he performed an open reduction and internal fixation of the right distal tibia on December 20, 2017. (*Id*. at 577-578, 704-706).

In January 2018, Plaintiff remained off the extremity, using crutches for ambulation. (ECF No. 12-1, pp. 632-635). His left shoulder continued to exhibit a decreased range of motion, as did his right ankle. Nurse Oxford referred him to physical therapy.

Follow-ups with Dr. Clayton in January and February reveal an uncomplicated convalescence period. (ECF No. 12-1, pp. 706-709). In March, he advised Dr. Pitts that the pain medications helped but did not last very long. (*Id*. at 706-707). As such, he had run out of pain

medication. Dr Pitts refilled his Gabapentin and Norco, prescribed rehab exercises, and offered him additional epidural injections for his lumbar pain. However, Plaintiff again declined the injections.

On April 3, Plaintiff reported twisting his back and ankle when his right leg gave out on him. (ECF No. 12-1, pp. 502-503). He exhibited a very limited range of motion in his lumbar spine with pain into his right hip. Dr. Pitts prescribed PT, an increased dosage of Norco, and Tizanidine.

In May, the Plaintiff reported that the muscle relaxer helped him sleep, but his legs were jerking "real bad" at night. They were also buckling under him. (ECF No. 12-1, p. 501). He reported, however that past injections had been helpful and wanted to try them again.

On May 30, Plaintiff reported another fall, stating that this one primarily caused stiffness and pain with both sitting and standing. An exam showed a reduced range of motion in the lumbar spine with both flexion and extension. (ECF No. 12-1, pp. 499-500). As such, Dr. Pitts refilled his Norco and Gabapentin.

In June 2018, Plaintiff continued to experience stiffness in his legs and back. (ECF No. 12-1, pp. 497-498). He also reported more pain in his right shoulder blade area. Further, the Plaintiff indicated that the Hydrocodone and Gabapentin remained effective.

After reviewing this evidence, the Court is concerned with the ALJ's determination that the Plaintiff can perform a range of light work. As the Plaintiff points out, the medical record fails to document significant improvement in the Plaintiff's condition after April 9, 2014. The ALJ appears to rely heavily on indications in the record that the Plaintiff's pain had stabilized on medication. The term stable, however, does not imply that his condition had improved. Stable simply means that his condition had neither deteriorated nor improved, saying nothing about

whether his symptoms are disabling. *Newsom v. Colvin*, 2015WL1268186, at *9 (N.D. Iowa Mar. 19, 2015) (holding stable does not mean the same as normal, or healthy, or functional, as the Defendant implies); *Cox v. Barnhart*, 345 F.3d 606, 609 (8th Cir. 2003) ("It is possible for a person's health to improve, and for the person to remain too disabled to work."); *Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001) ("[T]he Commissioner erroneously relied too heavily on indications in the medical record that [the claimant] was 'doing well,' because doing well for the purposes of a treatment program has no necessary relation to a claimant's ability to work or to her work-related functional capacity."). In fact, the records call into question the Plaintiff's ability to reach with his upper extremities and to stand and walk for six hours per workday as is required of light work.

Therefore, because a large portion of the record was undeveloped at the time the RFC assessments were proffered in 2017, remand is necessary to allow the ALJ to obtain updated RFC assessments. *Frankl v. Shalala,* 47 F.3d 935, 938 (8th Cir.1995) (finding that RFC forms prepared by a consulting, non-examining, physician "cannot constitute substantial evidence that [claimant] was capable of performing the full range of light work ... because the opinions in these agency RFC assessment forms . . . were not based upon the full record in this case.").

On remand, the ALJ is further directed to order a consultative orthopedic exam, complete with a full RFC assessment that accounts for all limitations arising from his back, shoulder, knee, and foot impairments.

### IV. Conclusion

Based on the foregoing, I recommend reversing and remanding this case to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

**The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. We remind the parties that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 1st day of August 2022.

/s/ *Mark E. Ford*
HON. MARK E. FORD
CHIEF UNITED STATES MAGISTRATE JUDGE